It's not before this court. As a matter of fact, the trial court noted that the government vigorously disputed their allegations and in fact, without addressing any matters in particular, the government did specifically provide affidavits that the government was prepared and willing to share that information. I'm just asking the factual question, which is, were the contractors given the entire technological knowledge of the Air Force at the outset of this contract? It's a historical fact. Either they were or they weren't. Within the constraints of a public courtroom, I can't answer that question, Your Honor. I will then say the government was prepared to vigorously litigate that issue, although the Court of Appeals rejected it. It's not relevant. Just for all the times I've been on this case, I've always wondered about that, but it's not relevant to the outcome. All right. Let's hear from Mr. Cooper on Rabat. Thank you very much, Mr. Chief Judge.    It's not relevant. I've just, for all the times I've been on this case, I've always wondered about that, is truly the heart of our submission to this Court. And the argument that we've just heard from Mr. Sneed and the colloquy that it entailed brings into sharp focus why it is so important that the government establish a contract schedule if it desires to impose a schedule regimen and ultimately a default termination on the basis of a failure to make adequate progress. Do you agree that you could have been terminated for default between June and the mid-Fall? No, Your Honor. No. What about the statements of the CEOs that they were 12 or 14 months behind or whatever it was and that they weren't going to meet the dates and that they wanted the entire nature of the contract changed to a cost plus profit instead of fixed price? At the time that these companies were vigorously committed and progressing and performing under this contract, they were, as you suggest, engaged in an effort to negotiate a new and different deal. They were offering a plea to the government, yes, but that did not change the fact that they were committed. I don't understand why you just don't admit, yes, in August they could have been defaulted, but they weren't and therefore the government stuck with its decisions. But you seem to be trying to argue, well, no, they couldn't have been defaulted in the summer or early Fall despite the admissions of their executives. Your Honor, I don't think there was ever a time when they could have been defaulted because of a failure to give adequate assurances with respect to their financial capacity and willingness. The trial court again, after a trial, concluded the contractor's financial condition was not endangering the performance of the 812 contract. On the timing, if I'm the maker and I admit I'm 12 months behind the schedule, it seems like that's the end of the case. I'm in default. Now, the government doesn't have to lower the broom on me, but I'm admitting that I'm in default. I'm not making the deadlines. I'm not making the progress needed to meet the deadlines. The deadlines are going to be missed, I'm telling you right now. Then it's up to the government. Well, should we default them now or not? They chose not, but it seems like they could have. Well, they would have had to, I see now, I'm sorry, Your Honor, maybe I misunderstood. You thought he was trying to take away your adequate assurances, so you were being protective. But Your Honor, I do believe that at the time in June or July or in that period in 1990, what the contracting officer would have had to do in order to impose a default judgment would have been to engage the Lisbon analysis. If he did, if he concluded that there was no reasonable likelihood, Your Honor, we of course would have contested that. But yes, that would have been the discipline that the government would have had to engage in order to impose that remedy. And this is our point, Your Honor, for the government to impose this drastic remedy. The conditions and the requirements of law must be satisfied. The tools to satisfy them are in the government's own hands. But aren't you saying then that once they decided to relax the schedule for the eight sequential prototype aircraft, they really were required by the law to relax the schedule for the lot one further test aircraft? We believe that as a matter of law, they did disestablish that schedule. They could have imposed a new schedule that included the events afterwards. You're not responding. Sorry. It seems to me that the logical implication of your argument is, necessarily is, that once they decided to forgive any possible default as of the summer and fall and relax the prototype delivery dates by issuing the unilateral P46, that they necessarily also had to relax all the downstream dates correspondingly. And since they didn't do that, they're trapped. Your Honor, it is our submission that because they didn't do that, those dates were disestablished and the court held. But that doesn't give you forever. That's the thing. You say because they didn't do that, that sort of implies that you want us to then rule that you could have done it at any point forever and that they could never terminate for default because they disestablished one portion of the schedule. That doesn't make sense to me. And it wouldn't make sense to me either, Your Honor, to at whatever moment the government became dissatisfied with the progress with respect to the rest of the schedule. It could have imposed a new schedule and then it could have tested our progress against it. But until it did that, until it satisfied the conditions of the law that governs their conduct in this area, then yes, forever was the answer. In other words, preventing that nonsensical result was in the government's own hands. Why isn't it a better view to say that the dates may have been disestablished as a matter of law, using your phrasing of it, but if the contractors were to be let off the hook, it would have to be clear that they could have produced the lot one planes within a reasonable time frame. Not by the original contract date, but not forever, either by a reasonable time frame given the original sequence of the original schedule. Your Honor, I think the colloquy of Mr. Sneed brings into sharp focus why lawyers and judges can't do what the government and the contracting officer are required under Lisbon to do and do that a decade and more after all the facts. That is, extrapolate some kind of new and reasonable and presumably linear contract schedule, which just, Your Honor, in fact, one of the reasons the judge didn't do that, we say he can't as a matter of law under, we believe, De Vito, but the government agreed in the court below that the trial judge could just extrapolate some new, to him, reasonable schedule, impose it on this record, and decide for himself whether or not there was any reasonable likelihood. That's, Your Honor, why we have Lisbon, why we have law. All right. I'll open my time. Thank you. Thank you, Mr. Roehrig, your rebuttal. Thank you, Your Honor. The one point is critical in terms of the court's thinking about whether it would be appropriate for the trial court to impose a reasonable future date. And it's just the phrasing of it seems critical to me in that the burden of proof is on the government, and therefore it wouldn't, it shouldn't be incumbent on the contractors to show that there's a reasonable date out there and they could meet it. The law would have to be that it's incumbent upon the government to show that there's a reasonable date out there. Well, I was wondering whether there was something incumbent on the trial court, to kind of put it on either part. Well, I just wanted to make sure, it seems to me that's, given that the burden is on the government, that's got to be the standard. And it's telling. You know, the government didn't try to make a case like that. It obviously had ample opportunity to do so here, and it didn't try to make a case like that. And I think you can read a lot into the fact that they didn't. What do you mean by that? We can read a lot into the fact that we're supposed to make some kind of factual inference as if we were a trial court. No, I think the burden of proof is on the government here. And the government did not endeavor to make a showing that if there were a reasonable extension of the contract, we couldn't make it. They didn't try. I think that Mr. Singh's argument is we did exactly make such a showing, among others. Well, but, and that's where I'm taking my second point, which is that in terms of what Judge Hodges actually found and didn't find about the performance and what performance was endangered, the statement is on page 54 of the opinion, and the statement is as follows. The yardstick shows, his yardstick analysis, the yardstick shows that the contractors were behind schedule at termination according to a self-contained series of milestones, not in relation to the entire contract. He quite clearly says he is not extrapolating from the Pooh 46 performance to say anything about the contractor's ability or inability to meet a reasonable schedule or any schedule with respect to the contract as a whole. Now, just one last point I'd like to make, because I do think it's very important. I understand that the court seemed to at least express some skepticism about the government's current argument that they reserved the right to enforce the original contract dates at the same time they imposed Pooh 46. I wouldn't read too much into any question or frown by any member of the panel. And that's precisely why I... It's a complicated case, and we'll be deciding it based on the record. The questions are just so we can learn more, not to reveal some possible position. And that, Ron, is precisely why I want to make this last point, which is I think it's critical to look at what the government's lawyers actually said about this precise issue of whether that boilerplate language in the Pooh 46 amendment reserved their right to enforce it. The site for convenience is on page 47 of our brief. But the government's lawyers said three things. First, they said that that interpretation, which at that point the contractors were urging to try to show that Pooh 46 was unreasonable, was, quote, silly, unquote. The second thing they said is that it was never intended by anyone. And the third thing they said was that, quote, the contractors knew that the postponement of the dates for aircraft one through eight, in other words, the prototypes, reasonably delayed the dates for the lot one aircraft, unquote. That is what they said about the argument that I'm making now is 180 degrees opposite from what they are saying to this Court now. And it's also fatally inconsistent with the testimony of their key witness, Captain Elverfeld, the program manager, who said that Pooh 46, quote, was not meant to imply that there was any intent or any thought that those aircraft could be delivered earlier than the FSD aircraft. So I just want to make sure that's clear with respect to that argument by the government. All right. We thank all counsel for a very thorough exposition. We'll take the appeal under advisement.